The next argued case is number 162657 Meridian Products, LLC against the United States. Mr. DeFrancesco. Thank you, Your Honor. For the record, Robert DeFrancesco on behalf of the Lumen Extruders Fair Trade Committee. We would like to begin with a discussion of the lower court's decision in this case. We believe the Court of International Trade inappropriately applied existing precedent in this case and disregarded factual findings by the Department of Commerce in the original scope determination and substituted its judgment for that of the agencies. As such, we would ask this court to vacate the lower court's decision and reinstate Commerce's original scope determination with respect to the appliance handles at issue here. We believe the lower court's decision rests entirely on its own legal and factual determination as to whether the particular end caps of this appliance handle were or were not fasteners. That this court has said in previous instances, Commerce's interpretation of its scope is accorded substantial deference and in interpreting the language of the scope, that deference should have been applied here, especially as it relates to what is or is not a fastener. The determination as to whether a particular component then meets that definition of fastener, whether it's broader or narrower, is a factual conclusion, again, reviewed under substantial evidence, that we believe the lower court inappropriately substituted its judgment there as well on a factual ground as well. In both instances, as we said, the CIT inappropriately substituted its judgment for that of the departments. First, the lower court narrowly defined or interpreted the word fastener in this case as it relates to these end caps. The lower court believed that fasteners should be nuts, bolts, or screws, things that are generally made of steel. The scope language itself, as it relates to fasteners, talks about nuts, bolts, screws, but uses the language as such, or such as, rather, and et cetera. That's not limiting its exemplary of the types of fasteners, but it is in no way intended to limit those fasteners to just those types of things. In fact, it's not clear that the scope language was as precise as it should have been, but, I mean, Commerce didn't make any findings with respect to subassembly's language, or, I mean, or exactly what such as would mean, right? Well, so, Your Honor, two different decisions. In its remand decision, Commerce said because the court, the lower court, found that these end caps were not fasteners and were another component, that, therefore, the product didn't meet the scope definition at all, and, therefore, couldn't reach the parts and subassembly's portion of the scope at all. Now, we would say that if the court believed that the fastener language was ambiguous, it had to ask Commerce, in a remand, to go back, and using its interpretive guidance set forth in its own regulations under the K1 and K2 analysis, to interpret what is meant by fastener. And we think if they had done that, the petition itself, in this case, which is one of the items that are supposed to be reviewed under K1, and prior decisions and previous decisions of what a fastener is, it would have found that it is a much broader definition than the lower court applied. And, in fact, this — But wait. Yes, Your Honor. All the CIT did, Judge Stancy said Commerce's definition in the first instance of what fell within the scope was too broad. And he said that this particular thing doesn't seem to fall within that definition. But Commerce could have gone back and said, well, actually it falls within some narrower definition, and it didn't. We believe Judge Stancy's decision as to whether it was too broad or not was entirely premised on whether that end cap was a fastener or not. So if that end cap was a fastener, then it's an extruded aluminum form that's defined by its end use as a handle. That clearly meets the definition, even if you assume that that end cap — Commerce adopted. Correct. You're asking us to reverse that factual claim. Correct. Well, we're — we have two arguments. One, that the lower court improperly interpreted — substituted its judgment as to what is meant by a fastener to begin with, which is, in effect, a conclusion that Commerce was the party that should have been. But Commerce didn't, in its initial decision, didn't say, oh, and by the way, these are fasteners. Yes, it did. It said in its original determination that these end caps were, in fact, fasteners and didn't — because they were fasteners, it didn't remove them from the scope. The court concluded otherwise. So — and in its remand determination, Commerce said, you know, we are constrained by what the lower court found because the lower court said that these are not, in fact, fasteners. The lower court couldn't have gotten to the position it got to — if the lower court agreed with Commerce that they were fasteners, then they would have been subject merchandise. But that's — again, but that only matters if we're — if we're talking about the finished goods kit exclusion, right? Correct. Finished goods and finished goods kits, yes. Now, you're absolutely right. Commerce could have then addressed whether it was subject as parts or as a subassembly, and it declined. No, it didn't do that. It didn't do that. It could have. We believe it could have. Obviously, this court, in the curtain wall decision in Uanda, where it looked at curtain wall units as to whether it was subject merchandise, in that case, those curtain wall units contained more than just extruded aluminum parts, yet this court found that those were — that was subject merchandise because it was a part of the finished curtain wall. The same would be true here. This is a handle. Whether you agree that the fastener, the end cap is a fastener or not, it's a non-extruded part, but it is — the handle is an extrude. The handle portion is an extrusion, and it could not be attached to that oven, and the oven doesn't function without the handle. The handle is a part of the oven, and it would, therefore, be covered under that language as well, which we believe. But Commerce didn't address that issue on remand. But beyond that, Your Honor, the lower court's decision is premised, again, on this definition of whether that end cap is a fastener or not. And its interpretation that that fastener was not a — or that end cap was not a fastener, then the lower court moves to the conclusion that, well, therefore, in its assembly and it's out completely, it doesn't meet the definition at all. But again, as we just talked about, that's not true. This court has found that assemblies, like a curtain wall unit, are subject to the scope. So whether something is an assembly or not doesn't take it out of the scope. It's a question of whether — does that assembly then meet those other — Did Commerce ever say that these are assembled merchandise? No. The finished merchandise exception? Whether — I'm sorry, say that again. Whether they are assembled merchandise? It didn't say whether it was assembled or not. It does, in fact, say that the — in the petition request itself from the respondents, they call it assembled merchandise. It appears to be assembled from the schematic. So this is a focus. Again, I'm going to read you a question from Judge Reyna. How do you consider Type B handles, or do you consider them as an assembly or a subassembly? Why? And why is it significant? Certainly. So if it were an assembly, we still believe, again, as we've said before, this court has found other assemblies to be covered by the scope. So whether it's assembly or not doesn't necessarily take it out of the scope. Okay. If it were an assembly, you would then examine whether it's part of the final finished good. And in that scenario, this is a handle that's a handle for an oven. So the oven is the finished good, and this is part of that and ought to be covered. The fact that you have a minor non-extruded part that's associated with it doesn't necessarily take it out of the scope under that ground. And it's certainly, we believe, a subassembly of the oven, again, going back to that part language. So in either scenario, we believe it would be covered, but I think our basic argument is that the lower court in interpreting fastener or what was meant by fastener with respect to this end cap overreached. Right. But there might have been two other grounds on which Commerce could have reached the same conclusion and it chose not to do so. Yes, Your Honor. That's true. But the basis that this was taken out was based on the lower court's determination that that end cap was not a fastener and therefore didn't meet the definition, and then Commerce didn't reach those other two grounds. Okay. And like I said, again, in answering the other question, that this could be covered as an assembly or a subassembly or a part of the oven. It clearly is a handle for the oven. It's described as a handle for the oven. I don't know of anyone who buys an oven without a handle. You can't really use the oven without the handle. It's a part of the oven and could be covered under that ground as well. But at base, at root, the end cap we believe is a fastener. If the schematic demonstrates that it's a fastener, the respondents themselves in their initial petition described it as a fastener. It was appropriate for Commerce to define it as a fastener. And this court, while it hasn't expressly addressed what's meant by fastener, in a few other cases, Meridian Trim Kits being one of them and then District Cargo being another, those were cases where you looked at whether something was in or out under the finished goods merchandise exception and whether something was a fastener. And in those cases, we had brackets and we had iron buckles or locking mechanisms. Those were fasteners, and both of those were approved as being subject merchandise and not qualifying for those exceptions, which is exemplary of how that fastener language ought to be interpreted and how Commerce has interpreted that fastener language and we believe where these end caps would fit within. But the lower court did not get there. Thank you. Let's hear from the government. Ms. Hatfield. Good morning, Your Honor. Frances Hatfield on behalf of Meridian Products. The government has chosen not to brief in this manner. So we believe that the trade court's judgment in this case should be affirmed. There are three points I'd like to make. There was no determination in the underlining proceeding that end caps were fasteners. You will not find that anywhere in the scope of the decision. It is an assembly, and this product satisfies the finished good exclusion. So the court found fault with two in the underlying decision. The court found fault with two of Commerce's conclusions. First, the Type B handles did not qualify under the finished merchandise exclusion and they were not analyzed separately. They weren't analyzed at all. Right, so Commerce never actually separately said whether or not they satisfy the finished merchandise exception. That's correct, and they never examined the end caps to it, whether they were an assembly in that final scope ruling. Do you believe they could have gone back and disagreed with the CIT and said those end caps are brackets? Are fasteners? Yes, Your Honor, I think that they could have gone and done that. I think that it would have been a difficult thing for the government to have done because Judge Stansu said that that was a fanciful argument. And it's a little bit difficult to go back once the judge makes a comment during oral argument that that was a fanciful argument to go back and then say, oh, we think these are fasteners. And if you look at the type of things, let's use a justum generis in describing what a fastener is, a bolt, a nut, a screw, they're all steel articles, brackets, as was the case in the Meridian decision. They all have a commonality in them. That's something that the injected mold plastic end caps simply do not have. It seems a little odd, though, that type A and type C handles are covered by the scope order but that type B handles are not. There doesn't seem to be a huge distinction between the three categories. I would say there actually is a big distinction among the three categories. So we have with A and C, we have an extrusion. That's it. And you throw in some screws, it attaches to the oven. But in the case of the B handle, and that's the schematic that Judge Tansey looked at, you have these injected mold end caps, five pieces, that are screwed into the handle, and then it's from those injected mold end caps that you have two more screws that then attach that to the oven itself. So in A and C, you have a piece, a singular piece. With B, you have five pieces. And the AEFTC is kind of played loosey-goosey with what our scope request actually was, but I'd like to read the language because I think it's important. Type B handles are also for oven handle assemblies consisting of aluminum extrusions. And this handle is an assembly in the middle of the handlebar, extrusion piece, plus two plastic injection molded end caps at each end. The end caps are attached at each end of the handle to serve as a finished end, and the mechanism for attaching to the oven door. Holes are drilled in a line to match the door holes of the oven door for final assembly. Well, that's different from A and C. And, you know, everyone kind of plays loosey-goosey with the language that these plastic injected mold end caps are fasteners, but they're not. You couldn't go into a hardware store, and you wouldn't go in the bolt and the nut and the screw section and find plastic injection end caps as any of that sort of fastener hardware. It wouldn't be there. But it does seem like an artificial distinction. They're all extruded aluminum. They all serve the same purpose, and all that you have is the plastic insertion. Isn't that the difference? That you have a finished assembly versus— Yes. Well, you do have a finished assembly. Well, in a Type B. Yes, that is a finished assembly. It's a finished product, whereas with the extrusion pieces, you don't have an assembled anything. Nothing's assembled in A and C with those two types of handles. Wouldn't one think that the extruded aluminum component is a dominant component and ought to control the result? That could have been a determination that Commerce could have made, but they didn't make any finding regarding that in the scope ruling. They didn't address that at all. And so that could have been a fact finding. We don't have it before us, and we don't have that speculation. And our standard of review, you know, in this matter is whether or not the CIT, when reviewed in Commerce's scope ruling, it was whether it was supported by substantial evidence. And that's what the CIT determined in the underlying matter, was that it was, in fact, not supported by substantial evidence. It wasn't discussed at all. And so there was no basis for Judge Stansu to make a determination regarding the findings, the end result of that finding. So there was no discussion in Commerce's decisions about the substantial component aspect. In other words, whether the content was such that it was more of one and less than the other or that it was or wasn't relevant, it's not there. But you're not saying that it required discussion when it was so conspicuous. I think it does absolutely require discussion. You can't come to the end result that the product doesn't contain additional pieces. Mysteriously, these plastic injection end caps, they transform into fasteners. If that was going to be a finding by Commerce, then they should have said so. And then when given the opportunity to do so on remand, they did not. So the scope excludes finished merchandise containing aluminum extrusions as parts that are fully and permanently assembled and completed at the time of entry. So we have a handle that's permanently and fully assembled and completed at the time of entry. And we have five pieces. The two end caps, the screws that are used to attach the end caps to the handle itself, and the aluminum extrusion. And Commerce made a finding of fact that was contradicted by all of the evidence in the case, and that is that there were only screws and aluminum extrusions when, in fact, there were additional pieces. So the problem began with Commerce's scope ruling and its description, where it describes all of the Type B product. And then it gets to the end, and it says it consists entirely of aluminum extrusions with the exception of fasteners. When our ruling request didn't mention fastening or fasteners in it. And Commerce took the plastic end caps out of the equation with no explanation and no finding. And so somehow this metamorphosis is what Judge Stansu had a problem with. And, you know, Judge Stansu looked at the court schematic when reaching its decision. And the problem for the court was that Commerce forgot about these end caps. I mean, that's the summary of it. And because they did not describe it, there wasn't enough facts to support Commerce's conclusion. There wasn't substantial evidence on the record as regarding this and adequate support for it. And to the extent that the appellant is claiming that somehow the Assembly fails to satisfy the finished merchandise exception, five pieces attached together, included in a package with screws and instructions for a product to attach to an oven, well, that would be a final product, and nothing needs to be done other than attach it. And that's the analogy that they're attempting to make, that there should be some additional input. Well, that's, you know, one of the articles that is excluded from a finished product in the exclusion order are windows. And that's, you know, somehow saying that, you know, a finished window isn't complete because it needs to be attached to the home or that the home is the additional article. That seems to be a strained argument. The scope order for finished goods specifically says windows are excluded. It makes no reference to the fact that a window has no purpose. Well, a finished good would be an oven, right? Sure. With all the handles and everything on it, but you still have to install the oven. I would say that an oven handle is not a subassembly to an oven. You know, it's not an integral piece that is the working or the nature of the oven that is needed, like the ignition to a gas stove. How do you open a hot oven without a handle? Sure. You could not. At the same time, if you were going to change out as a decorative piece, do you want a stainless steel oven handle or would you like a black oven handle? You know, and this is one of the things that as an aesthetic measure you would change out. It's a finished article for an aesthetic purpose. Let me ask you. Judge Reynes asked a question that brings us back, I think, to the issue here. How do you reconcile the fact that under the CIT's interpretation, if the plastic end pieces were unattached and imported in a kit with a handle, then it would be within the scope of the order? That is, the only difference seems to be whether it's attached or unattached. I would say then it would qualify under the finished goods kit. You know, that isn't the facts before us. We're dealing with a finished good. But if it was unassembled, then we have the finished goods kit exclusion. And so in that circumstance, I would say it would be a finished goods kit. So he says, how do you reconcile this difference in treatment, in customs treatment? Yes, it would be if we were to change the import analyses, unassemble that product, put it in a bag, then we have a finished good that would be subject to the finished good kit exclusion. So you're saying it can't be reconciled? It can't be. It goes either in the finished good kit if assembled, or the finished good kit exclusion if unassembled. So in one instance it falls within a specific exclusion, and in the other it just falls outside the scope? Correct. Well, that's what was held, and it does seem like a curious result. Does it not? No, it does not. You don't think so? Well, the scope of the orders is as written. You know, it's not our place to determine beyond the scope of the language of the orders. So it's there, and does it meet the exclusion on its face, or does it not? And we have an assembly that's finished, that's imported as a finished assembly. It meets the scope of the exclusion. So even, you know, and this applies to a downstream product, and that was the heart of the SMBC ruling, when a product requires no further fabrication, that you have a finished good. And again, in drapery rail kits, it would be a little bit silly to say that you need to have curtains imported with a drapery rail kit in order for it to be a finished good. A drapery rail kit is a customized product, so obviously there are instances in which you are importing something that has a future use that does not contain all of the elements, such as draperies on a drapery rail kit. And these oven handles are really only suitable for a specific application, as was the case with the anodes ruling and solar mounts attached to solar panels. And so, you know, the last thing that is said in the brief is that this is somehow a roadmap for circumvention, and I would say that would be just to the contrary. You know, what really is the case for importers is they need to have reliability. They need to know how their product either complies or does not comply with anti-dumping duty orders, given the huge amount that is at issue with an anti-dumping duty or countervailing duty order. And so, you know, what we need is some sort of certainty. We need to be able to read a ruling and say, this is the result. And when commerce misses a step and doesn't explain how it got from A to B and misses parts of a product in its scope ruling, you know, that doesn't give the kind of certainty and finality that an importer needs in making its decision. And, you know, I want to be careful that we aren't dealing with a subassembly here. You know, there's been some loosey language about this being a subassembly. This isn't a subassembly. This isn't a partially assembled product. You know, this is a finished assembly. And I think that that's all I have for the court, unless you have some additional questions for me. No. Okay. Thank you. Mr. DeFrancisco. Thank you, Your Honor. Just quickly, I'd like to address a few quick points. Yes, the Department of Commerce did, in fact, find that these end caps were fasteners. At page 2 of its original scope determination, it's Appendix 60. I'll quote, the end caps are used to fasten the handle to the door. Then, if you go to page 12 of the decision, when it talks about the Department's position, at paragraph 2 there, aside from the inclusion of fasteners for Type B handles, at that point, when the Department found that the end caps were used to fasten to the door, when it talks about fasteners, it's talking about the screws in the end caps. And so it did find that they were fasteners. Why did it find that they were fasteners? Because the respondent, in its petition, said the end caps were used to fasten the handle to the oven door. It has to be a fastener. You cannot attach that handle to the oven door without the end cap. Therefore, it's a fastener, as you pointed out. Quickly. Do you see no difference between A, B, and C? No, I do not. They're all covered merchandise. Just quickly, Judge Reyna's question about wouldn't this lead to inconsistent decisions. Yes, it would. Not necessarily inconsistent, but curious. Curious, sure. We would say inconsistent and inappropriate conclusions. The end cap here is a fastener. If it's a fastener and it's attached to the handle, under their interpretation it's out as a finished good, yet if it were not attached to the handle, it would be subject to the product because it's not attached and it's a fastener. You can't have two different interpretations of the same exclusion. Commerce has consistently, when interpreting both the finished goods kit and the finished goods exclusion, has said these are essentially two of the same things. One happens to be assembled and one is unassembled, but in a sense is a finished good and therefore would be excluded. This end cap is a fastener and it has to be subject merchandise whether it was attached to it or not. And then again, as we've said, the mere fact that it's an assembly doesn't take it out of the definition of the scope. It is an extruded product that meets the definition of the scope defined by its end use here as a handle. The second step would be whether it meets any of the definitions of the exclusions, but the lower court didn't get there. The lower court simply concluded that this doesn't meet the definition of a fastener and went on from there. Getting to their point about fasteners having to come off the shelf from a hardware store, that is not found in the language of the scope. That's what the lower court, how it interpreted what it meant by fastener. We would posit that that is inappropriate to the extent the lower court had a problem with what is meant by fastener. It's for Commerce, using its interpretive guidance under K-1, to determine with respect to this scope what is meant by fastener. The lower court said that they're not fasteners because they are molded parts that are actually part of the assembly. They didn't, you know, and then you still have to separately fasten them to something. It's a molded part that's attached to the extrusion that's then used to fasten that handle to the oven. Without that molded part, you couldn't have attached that handle to that oven. And they admit that. They said the end cap is used to attach the handle to the oven. That's a fastener. Whether it's a molded part or not, it's still fastening that handle to the oven. The problem is that the scope order was just not clearly written and that the lower court just felt that, you know, that language was chosen by Commerce and they can't then just morph it into something else. Your Honor, to the extent the lower court felt the language wasn't clear with respect to what was meant by fastener, the lower court should have asked Commerce, using the K-1 analysis, to go through its interpretive guidance to determine what's meant by fastener. It didn't do that. It simply said, I don't believe under its analysis what's meant by fastener. Well, you said the common and ordinary meaning of the term just doesn't allow such a broad reading. But with all due respect, Your Honor, common and ordinary meaning is not necessarily part of Commerce's regulations as to how it interprets a scope and whether something's ambiguous or not. It's supposed to refer to the petition language and the other elements that go into interpreting that scope. And in the petition, frankly, the language about what is meant by a fastener is broad. It's beyond the sort of off-the-shelf hardware that the respondents have claimed. I see my time is almost up. Unless you have any other questions, Your Honor. Any more questions? Okay. Thank you. Thank you both. The case is taken under submission. And that concludes the argued cases for this session. All rise.